**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Ashland Inc.,<br><br>Defendant. | ) | Criminal No. 02-152 (JMR)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF ASHLAND INC.'S MOTION FOR EARLY TERMINATION OF PROBATION** |

Defendant Ashland Inc., pursuant to 18 U.S.C. § 3564(c) and Federal Rule of Criminal Procedure 32.1(c), seeks an Order for the early termination of the five-year term of probation previously imposed by this Court. Defendant Ashland Inc. seeks the early termination of its probation because such relief is warranted by its conduct over the past three years and by the interest of justice.

## BACKGROUND

A three-count Information was brought against Ashland Inc. ("Ashland" or the "Company") on May 13, 2002. On that same date, pursuant to a Plea Agreement, Ashland appeared before the Court and entered pleas of guilty to Counts II and III of the Information. Prosecution on Count I was deferred, pursuant to the Plea Agreement, for a period of up to four years. Count II, a misdemeanor, charged negligent endangerment under the Clean Air Act in violation of 42 U.S.C. §§ 7412, 7413(c)(4), and 11002(a)(2). Count III, also a misdemeanor, involved a false certification or writing on July 14, 1997, in violation of 18 U.S.C. § 1018. All counts of the Information stemmed from a sewer fire that took place at the St. Paul Park refinery

on May 16, 1997, when the facility was owned by Ashland. Pursuant to the Plea Agreement, Ashland undertook to make certain fine and restitution payments, to place notices in major area newspapers, to conduct a workshop at a national petroleum conference, and to upgrade all process sewers, junction boxes, and drains at the St. Paul Park refinery to comply with Subpart QQQ standards (the "QQQ Upgrade"). All of these requirements of the Plea Agreement have been met by Ashland, and, as a result, on February 22, 2005, the Court ordered the dismissal with prejudice of Count I of the Information, the deferred count of prosecution.

Less than eight months after the events that led to the Information took place, but several years before the government investigated and brought criminal charges, Ashland transferred ownership of its St. Paul Park refinery to Marathon Ashland Petroleum LLC ("MAP"). MAP is a Delaware limited liability company that came into existence on January 1, 1998. At its formation, MAP had two members which were stakeholders in the business: Marathon Oil Company ("Marathon"), which controlled and owned a 62% majority interest; and Ashland, which owned a 38% minority interest. Marathon and Ashland each contributed certain refining and marketing assets to MAP at its formation (including, on Ashland's part, the St. Paul Park refinery).[1] On June 30, 2005, Marathon purchased Ashland's interest in MAP. Accordingly, Ashland is no longer a member of MAP and has no ownership interest whatsoever in or control over the St. Paul Park refinery or in any of the other refining and marketing assets that it originally contributed to MAP.

At the sentencing hearing on December 23, 2002, and in the resulting Judgment, this Court placed Ashland on probation for a term of five years and ordered the retention of an

---

[1] On May 15, 1997, Ashland and Marathon entered into, and publicly announced, the signing of a letter of intent to combine their respective refining and marketing assets into a new corporate entity, MAP. The transaction was completed on January 1, 1998, at which time ownership of the St. Paul Park refinery was transferred from Ashland to MAP.

independent, environmental Probation Consultant to review and monitor Ashland's compliance with the applicable terms and conditions of its probation. Thereafter, the Court approved the appointment of Frank B. Friedman of Frank B. Friedman & Associates, L.L.C., as the Probation Consultant in this matter.

Ashland's five-year term of probation commenced on December 23, 2002. *See* 18 U.S.C. § 3564(a). Because Ashland has fully satisfied the requirements of its Plea Agreement and the terms and conditions of its probation, and the purpose of probation has been fully served in this case, Ashland respectfully requests that its term of probation be terminated early as of December 23, 2005. The United States Attorney's Office for the District of Minnesota, the United States Probation Office for the District of Minnesota, and the Probation Consultant, Mr. Frank Friedman, do not oppose Ashland's request.

## ARGUMENT

Title 18 U.S.C. § 3564(c) provides:

> "The court, after considering the factors set forth in section 3553(a) to the extent that they are applicable, may, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, terminate a term of probation previously ordered and discharge the defendant at any time in the case of a misdemeanor or an infraction or at any time after the expiration of one year of probation in the case of a felony, if it is satisfied that such action is warranted by the conduct of the defendant and the interest of justice."

Accordingly, the decision of whether to terminate early a term of probation imposed on a defendant such as Ashland is committed to the sound discretion of the Court. Here, consideration of applicable factors under Section 3553(a), of the terms and conditions of probation and the requirement of the Plea Agreement, of Ashland's conduct, and of the interest of justice supports granting Ashland's motion for the early termination of its probation.

## I. <u>Applicable Section 3553(a) Factors</u>

The relevant factors to be considered by a court in imposing a criminal sentence are set forth in 18 U.S.C. § 3553(a), and those factors are also to be considered to the extent they are applicable in reviewing a motion for the early termination of a previously imposed term of probation. *See* 18 U.S.C. § 3564(c). In this case, those applicable factors include:

**A. "The nature and circumstances of the offense and the history and characteristics of the defendant."** The crimes to which Ashland pled guilty were misdemeanors, and the deferred felony count of prosecution has now been dismissed with prejudice. Ashland is a corporate defendant that is a public company. As such, Ashland regularly makes numerous public filings regarding its activities and financial affairs. As discussed below, Ashland's compliance efforts and conduct over the past three years have been exemplary.

**B. "The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant."** The sentence imposed on Ashland was serious indeed. As part of that sentence, Ashland has paid fines in the amount of $5,400,000, restitution in the amount of $3,750,000, and an additional amount of $500,000 for the services of the Probation Consultant. In addition, Ashland has placed notices regarding the operative facts of the sewer fire and the resolution of the criminal case in area newspapers, sponsored a Subpart QQQ workshop at a national petroleum conference, worked and cooperated with the Probation Consultant, and completed the upgrade of all process sewers, junction boxes, and drains at the St. Paul Park refinery to comply with Subpart QQQ standards at a cost in excess of $9.4 million. On top of all this, Ashland has served a three-year term of probation with both standard and special terms and conditions. Such a sentence,

which is far from lenient, surely promotes respect for the law and provides a just punishment for the offenses involved and adequate deterrence to criminal conduct. Moreover, given Ashland's significant compliance efforts and involvement with the Probation Consultant, the sentence also protects the public from further crimes.

**C. "The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."** A three-year term of probation for Ashland will not create any disparity with other similarly situated defendants. For example, in another significant criminal environmental case in the District of Minnesota involving Koch Petroleum, that defendant was given a three-year term of probation. At the time of sentencing in this case, and pursuant to the Plea Agreement, the government argued for a term of probation that would last as long as was needed to fulfill Ashland's obligations under the Plea Agreement. Those obligations have all now been satisfied by Ashland.

**D. "The need to provide restitution to victims of the offense."** Ashland has paid the full amount of restitution ordered, $3,750,000. In addition, Ashland has provided health and dental insurance for Randy Danielson and his family, and has committed to continue providing such insurance on an ongoing basis. Ashland has fully satisfied its restitution obligations under the sentence imposed by this Court.

Therefore, the applicable Section 3553(a) factors provide a basis for granting Ashland's motion for the early termination of its probation.

## II. The Terms And Conditions Of Probation And The Requirements Of The Plea Agreement

Ashland has fully complied with the standard conditions and the special conditions of its probation, which incorporate the requirements of its Plea Agreement, as follows:

**A. "The defendant shall submit periodic submissions reporting concerning Ashland Inc.'s financial condition as directed by the probation office."** Ashland has submitted to the Probation Officer a copy of each Form 8-K, Form 10-Q and Form 10-K that it has filed with the United States Securities and Exchange Commission.

**B. "The defendant shall submit to a reasonable number of regular or unannounced examinations of the corporation's books and records by the probation office or experts engaged by the Court."** The Probation Consultant has been provided access to numerous records of Ashland. No such examinations of books and records have been requested by the Probation Officer.

**C. "The defendant shall be required to notify the probation office immediately upon learning of any material adverse change in the organization's financial condition, or litigation, criminal prosecution or administrative proceeding against the organization, or any investigation or formal inquiry regarding the organization."** Ashland has prepared for the Probation Consultant a quarterly report that addresses these areas as well as any current issues of potential significance and the status of Ashland's progress on the recommendations of the Probation Consultant. The Probation Consultant has reviewed and summarized the report and then has sent a quarterly progress report to the Probation Officer. When Ashland has received a copy of the Probation Consultant's report from the Probation Officer, it has distributed that report to senior Ashland officials to ensure monitoring and oversight of Ashland's response to the Probation Consultant's recommendations.

**D. "The defendant shall comply with the recommendations and requirements of the Court with respect to ensuring that any compliance program will adequately prevent or detect any future violations of law."** No specific recommendations or requirements have been

made by the Court with respect to Ashland's compliance program. However, the Probation Consultant has visited numerous Ashland locations and has made a number of recommendations concerning Ashland's Environmental Management System and location-specific practices. These recommendations have been evaluated and addressed in a timely fashion. Examples of action taken by Ashland include: the design and implementation of enhancements to its Environmental Management System; the institution of a formal best-practices sharing process; the improvement of product and waste storage practices; the utilization of more sophisticated root-cause analyses for incidents; the use of more leading indicators in management briefings; the use of annual self-assessments in management systems; the implementation of a risk-based preventive maintenance program for critical equipment with regard to environmental, health and safety; the design of a program to enhance field resources for environmental, health and safety; the installation of parabolic mirrors in warehouses to enhance fork-lift safety; the pavement of areas used to store loaded tank wagons; and the encouragement of seat-belt usage at warehouse operations.

**E. "The defendant shall designate a corporate officer, including a corporate officer at Ashland headquarters, who shall bear personal responsibility for implementing and overseeing the fulfillment of the conditions of probation during each year of the probation provided in this Judgment and Decree."** By letter dated April 3, 2003, Mr. Glenn Hammer, Vice President – Environmental, Health and Safety, was identified as the designated corporate officer. After his retirement, Mr. Hammer was retained as a consultant to ensure proper completion of the QQQ Upgrade at the St. Paul Park refinery. Ms. Karen T. Murphy succeeded Mr. Hammer as Vice President – Environmental, Health and Safety, and also as the designated corporate officer. Also by letter dated April 3, 2003, David L. Hausrath, Senior Vice President, General Counsel and Corporate Secretary, who also serves as Ashland's Chief Compliance and

Ethics Officer, was designated as the corporate officer at Ashland headquarters responsible for implementing and overseeing the fulfillment of the conditions of Ashland's probation.

**F. "The officer designated in Paragraph e above, and the St. Paul Park refinery manager shall allow appropriate access to the St. Paul Park refinery to allow the United States Probation Office, and its environmental consultant, to monitor and ascertain the defendant's completion of the sewer upgrade project and to assure Ashland's compliance with the terms of probation."** Pursuant to this special condition, the Probation Consultant visited the St. Paul Park refinery on May 8, 2003, September 24, 2003, May 13, 2004, and August 9, 2004. The Probation Officer accompanied the Probation Consultant on the May 8, 2003, visit in order to gain familiarity with the refinery and the scope of the QQQ Upgrade project. Following the August 9, 2004, visit, the Probation Consultant and representatives of Exponent Inc., the technical resource to the Probation Consultant, approved the completion of the sewer upgrade to Subpart QQQ standards.

**G. "The defendant shall fully cooperate with the EPA and MPCA during current and future environmental audits and investigations."** At no time was an inspector delayed or turned away from any Ashland facility. Local inspectors conducted 57 inspections at Ashland facilities in Minnesota from the period December 2002 to the present. Of those inspections, 45 were environmental in scope.

**H. "The defendant shall upgrade all process sewers, junction boxes and drains at the St. Paul Park refinery to comply with Subpart QQQ standards."** The sewer upgrade project was completed at the St. Paul Park refinery in August 2004. At the time of sentencing in December 2002, Ashland initially estimated that the QQQ Upgrade would cost approximately $4 million and take approximately four years to complete. In fact, this project was completed in less

than half the four-year time allowed under the Plea Agreement, and it was done at a cost in excess of $9.4 million. The Probation Consultant inspected and approved the project, and the United States Probation Office for the District of Minnesota and the United States Attorney's Office for the District of Minnesota entered into a Stipulation and Order to dismiss with prejudice the deferred felony count of prosecution based upon the completion of the sewer upgrade project. This Court signed the stipulated Order on February 22, 2005, and the deferred felony count was dismissed with prejudice on March 11, 2005.

**I. "The defendant shall sponsor a Subpart QQQ workshop at a national petroleum conference, in cooperation with the U.S. Attorney's Office."** Ashland sponsored such a seminar and workshop on April 24, 2003, as part of the National Petroleum Refiners Association Environmental Conference held in New Orleans. Information and materials regarding that conference were provided for review to the United States Attorney's Office for the District of Minnesota.

**J. "The defendant shall place a one-page notice or statement acknowledging the operative facts and referencing the resolution of the instant offense in both the *St. Paul Pioneer Press* and the *Minneapolis Star Tribune*. Defendant shall provide the Government and U.S. Probation Office with copies of any written public comment regarding this matter."** Such one-page notices were placed and ran in the *St. Paul Pioneer Press* and the *Minneapolis Star Tribune* on December 28, 2002. Ashland has not made other such public comment regarding this case.

**K. "The defendant shall pay a fine in the amount of $5,400,000, $500,000 for a Probation Consultant, and restitution in the amount of $3,750,000."** All required fines and restitution and amounts for the Probation Consultant have been timely paid by Ashland.

**L. "The defendant shall procure health insurance coverage for Randy Danielson and his family comparable to his coverage with MAP at the time of the Plea Agreement."** Since January 1, 1995, Randy Danielson, his spouse, and two dependents have been, and they continue to be, covered by Ashland's medical and dental insurance plans.

**M. "The defendant shall not commit another federal, state or local crime."** Ashland has complied with this condition of its probation.

Thus, there is no need to continue Ashland on probation for purposes of securing its completion of any remaining obligations under the Plea Agreement or the terms and conditions of probation. Moreover, Ashland no longer has any ownership interest in MAP and, consequently, no ownership or involvement whatsoever in the St. Paul Park refinery, which was the facility at which the sewer fire at issue occurred.

## III. Ashland's Conduct Over The Last Three Years

Ashland has made extraordinary efforts over the past three years to create a new culture of compliance and responsibility at the Company, and those efforts have been highlighted by the following:

- **New Ashland CEO**. In November 2002, Ashland named a new Chief Executive Officer, James O'Brien. Mr. O'Brien has changed the direction of Ashland by focusing on wholly-owned businesses and ending the Company's investment in the refining and marketing business through the sale of its interest in MAP. In addition, Mr. O'Brien has stressed the importance of ethical values and compliance with the law. He has utilized and infused the Responsible Care process throughout the Company. This process was developed by the American Chemistry Council as a means of delivering excellence in environmental, health and safety ("EH&S"). This process is now an integral part of Ashland's values and operating principles, and the aspirational goals under this initiative are to operate with zero incidents, achieve 100 percent compliance, and reduce EH&S impact from the Company's activities. Mr. O'Brien's objective has been to create a highly-efficient compliance culture that achieves top performance relative to Ashland's peers, and this objective was endorsed by Ashland's Board of Directors. This objective has been captured in the term PACES (Proactive, Accountable, Collaboration/Teamwork,

External Focus, Speed), which has defined the direction for the Company under Mr. O'Brien. In a February 20, 2003, letter from Mr. O'Brien to all Ashland employees, he discussed Ashland's probation and stressed the importance of the Company's commitment to its *Code of Business Conduct* and dedication to improvement of EH&S performance at the Company.

- **Senior Officer Involvement In And Board Oversight Of EH&S Matters.** In addition to Mr. O'Brien's focus on EH&S compliance and performance, other members of Ashland's senior management team have placed an increased emphasis on compliance activities. Among the senior personnel devoted to compliance at Ashland are Karen T. Murphy, Vice President – Environmental, Health and Safety; David L. Hausrath, Senior Vice President, General Counsel and Corporate Secretary, who also serves as Ashland's Chief Compliance and Ethics Officer, as well as Chairman of Ashland's Compliance Committee; and Amelia D. McCarty, Senior Compliance Counsel, who was appointed to that position in January 2003 by Mr. Hausrath. Further, Mr. O'Brien and other senior officers have reviewed Ashland's probation status and compliance efforts with the Company's Board of Directors and its Environmental, Health and Safety Committee on a regular basis. At the March and September meetings of the Environmental, Health and Safety Committee, the Vice President - Environmental, Health and Safety presents a report on Ashland's EH&S compliance program. In addition, the Audit Committee of the Board of Directors of Ashland is knowledgeable of and oversees Ashland's compliance and ethics program. At its May and November meetings each year, Mr. Hausrath, as the General Counsel, presents a comprehensive report to the Audit Committee on Ashland's compliance and ethics program. Mr. Hausrath attends all Audit Committee and Environmental, Health and Safety Committee meetings.

- **New Environmental Management System.** Over the past three years, Ashland has developed and implemented an Environmental Management System in furtherance of the Company's mission to design, implement and certify a global management system to deliver excellence in environmental, health, safety and security performance. For its corporate processes, Ashland received certification to an external standard on July 28, 2005, by BVQI, an accredited registrar for the technical standard RC14001.

- **Meetings with Environmental Regulatory Agencies.** Soon after the Court entered its Judgment in this case, Ashland undertook efforts to meet face-to-face with state and federal regulators. To that end, senior Ashland officials, including Mr. O'Brien, met with EPA officials in Region IV and Region V during June and August 2003 and with EPA officials in Washington, D.C., in December 2004.

- **Improved Compliance And Ethics Program**. During the last three years, Ashland has significantly increased its compliance activities. In 2003, an on-line training course on the company's *Code of Business Conduct* was required for all employees with e-mail access (approximately 7,600 employees). In 2004, the

*Code of Business Conduct* was completely replaced by the *Business Responsibilities of an Ashland Employee*. A core team of 20 employees from around the world drafted this new compliance and ethics booklet with input from more than 100 other employees. In December 2004, a compliance survey was sent to 1,000 employees to determine a baseline of understanding prior to the launch of the *Business Responsibilities of an Ashland Employee*, and a follow-up was conducted in March 2005. In January 2005, the new compliance and ethics booklet, translated into 14 languages, was distributed to all employees, and all employees were given training utilizing either an on-line or manager-led training course. In addition, all employees except certain hourly workers were required to return a Questionnaire and Certification regarding compliance and ethics issues. Beginning in 2003 and ending in 2004, 10 teams of employees reviewed all existing corporate policies at Ashland. The revised policies were put into a common format and placed on FirstHand, Ashland's web-based intranet system. The policies were linked, as appropriate, to procedures, forms, and reference materials so that employees could easily obtain information and fulfill their compliance obligations. In addition, new policies were formalized, as was a process to request a new policy or changes to existing policies.

- **Compliance Committee**. In the spring of 2003, the Compliance Committee was formed with a mission to oversee and coordinate the activities that comprise Ashland's compliance program, including development of compliance processes and annual compliance plans. The Compliance Committee meets at least once each quarter. Among the Compliance Committee's goals and objectives have been the development and delivery of the new *Business Responsibilities of an Ashland Employee* compliance and ethics booklet and related training, questionnaire and certification; the design and implementation of a Responsible Care management system and efforts to achieve Responsible Care certification at eight U.S. sites of Ashland; the management of recommendations from the Probation Consultant and other compliance action plans; the development of a process for consistent discipline of employees; the evaluation and improvement of antitrust compliance program materials; and the implementation of compliance processes for internal control requirements of the Sarbanes-Oxley Act.

- **Compliance Communications**. In October 2004, Ashland's web-based intranet system, FirstHand, was re-designed, and as part of that effort, a "compliance portal" was established. This portal contains links to various compliance sites to make it easier for employees to find information on Ashland's compliance policies, training, written guides, and outside resources. The various business units and resource groups at Ashland have their own sites on FirstHand, which include postings on compliance topics, on-line training resources, and the promotion of new resources and training courses. On January 24, 2004, Mr. O'Brien delivered his first televised company-wide rally transmitted to over 10,000 employees at 25 locations in six countries. This rally was used to promote a new Ashland culture that emphasizes performance, responsibility, and compliance. Since that time, Ashland has held 10 rallies - three per year. The compliance issues discussed

during each rally have included Ashland's mission, vision, values, and operating principles. In addition, division presidents at Ashland have held division-specific rallies that have included compliance messages. Moreover, *The Source*, Ashland's internal publication produced for employees and retirees of the Company, has included numerous articles on compliance-related topics since December 2002.

- **Compliance Training**. Ashland requires compliance training and education for its employees. In 2003, Ashland entered into a license agreement for the use of a learning management system that enables central tracking of all training throughout the Company and allows Ashland to deliver training to employees on-line. Also in 2003, Ashland appointed a Compliance Training Manager to coordinate training events so as to ensure the consistency of compliance messages. To date, Ashland has delivered nine on-line legal compliance training courses to more than 60,000 participants. Some of these courses have included a manager-led component to reach employees without e-mail. Among the topics addressed have been the *Code of Business Conduct*; financial approval authority; antitrust and competition laws; the creation, protection and retention of information; the *Business Responsibilities of an Ashland Employee*; Responsible Care processes; and product stewardship. Further, in 2003, Ashland hired a full-time Environmental, Health and Safety Training Manager to oversee and coordinate regulatory training throughout Ashland. One of the goals of this EH&S Training Manager was to convert paper-based regulatory training manuals to on-line resources to ensure that employees received only the most current versions and communications. To date, 11 on-line resources have been launched by the EH&S Training Manager.

- **Compliance Assessment**. From December 2003 through February 2004, Ashland spent approximately $450,000 to retain Pilko & Associates to assist Ashland in conducting an EH&S compliance management system assessment of its U.S. operations. This assessment included interviews of EH&S personnel and senior management, site visits of 41 selected facilities, and self-assessment surveys of 60 facilities. The assessment focused on an evaluation of Ashland's management systems to achieve and maintain legal compliance with EH&S-related laws and regulations. Based on the results of the Pilko audit, Ashland has shifted its management of EH&S compliance issues from "reactionary, task-oriented and people-dependent" to "systematic prevention of problems."

- **Compliance Tracking**. Beginning in January 2005, Ashland began rolling out its Compliance Tracking System ("CTS"), which allows measurement of leading indicators for compliance. This database contains the Company's compliance requirements and identifies the responsible parties for these requirements and the deadlines for execution, and has a follow-up feature to track the status of each requirement. Moreover, Ashland has been standardizing its compliance checklists. As part of its planning processes, Ashland has spent more than $4 million to purchase an EH&S module in its GlobalOne SAP project, and this module addresses product safety (including product regulatory compliance), hazardous substances, dangerous goods (transportation regulations) and compliance tracking.

These compliance tools have greatly enhanced Ashland's delivery of compliance information and requirements, as well as the tracking of compliance performance. Further, EH&S policies and procedures have been transferred to a new document management system at Ashland. This system will allow EH&S documentation within sites and businesses at Ashland to link to policies and procedures.

- **Compliance Reviews**. Ashland has adopted EH&S audit and self-assessment techniques whereby audits and self-assessments are conducted by business, operating component or facility within the Company on a periodic basis. A third-party review of the EH&S audit program was conducted in 2003. In April 2004, the Probation Consultant reviewed Ashland's existing audit protocol and provided certain recommendations, which the Company adopted. Ashland's EH&S Department has conducted an Assurance Letter process, which is an annual review of key EH&S processes and significant issues by division senior management and the Vice President of EH&S documenting that appropriate efforts have been instituted.

- **Compliance Hotline**. Ashland maintains a reporting hotline (1-800-ASHLAND). This hotline is used to report crises and emergencies, as well as suspected illegal or unethical conduct, on an anonymous and confidential basis without fear of reprisal. This system uses a secure, toll-free number, e-mail, and post office box access to provide a means to receive reports while preserving the confidentiality of the individuals making those reports. The Security Department of Ashland receives all such calls or reports and refers them to appropriate components of Ashland for investigation, unless in their judgment no further action is appropriate based on the nature of the call or report. All calls and reports are tracked on the Case Log System and final disposition of a call or report is also recorded on the Case Log System. All case logs are maintained for a period of seven years, and a report of all activities of the Security Department is made each year to the Audit Committee. On May 14, 2003, the Audit Committee approved use of the hotline, which is accessible both inside and outside Ashland, as well as reports to the General Counsel, to serve as Ashland's complaint procedures under the Sarbanes-Oxley Act.

- **Process Safety Management**. Ashland is engaged in substantial efforts to improve process safety management. For example, the Company has undertaken to conduct and share results from nine facility risk assessments; to implement a formal process that facilities can use to identify, evaluate and manage risks specific to their locations and operations; to introduce the EH&S Incident Management System, which is an intranet-based system used by all divisions for purposes of centralizing and standardizing the recording, reporting and management of environmental, health and safety incidents; and to implement TapRoot, a web-based software program used to conduct incident investigations and problem solving. If a TapRoot investigation results in new learning, it is shared with all divisions through EH&S-issued Safety Alerts, and near-miss experiences are shared to improve the overall safety culture and performance within the Company.

Moreover, Ashland has adopted the Responsibility Index, which is a comprehensive index on EH&S performance that measures safety, compliance and impact. The Responsibility Index tracks and reports for Ashland in each wholly-owned division on a monthly basis, and provides a snapshot on how Ashland is performing against its objective of managing its businesses and operations responsibly and in keeping with the Responsible Care aspirational goals of operating with zero incidents, maintaining 100 percent compliance, and reducing Ashland's EH&S impact.

- **Probation Consultant**. Throughout its three years of probation, Ashland has worked cooperatively and openly with the Probation Consultant, Mr. Frank Friedman. Mr. Friedman has conducted numerous visits to Ashland facilities, reviewed many records of the Company, and met with Company personnel, the Environmental, Health and Safety Committee of the Board of Directors, and the full Board of Directors. Mr. Friedman's recommendations have been received by the Company and adopted as part of its on-going compliance efforts.

- **Community Activities**. In addition to its compliance activities, Ashland has been engaged in a variety of projects and initiatives that demonstrate good corporate citizenship, public outreach and community participation.

  Ø **Corporate Responsibility**. At the invitation of the United States Attorney's Office for the District of Minnesota, Mr. Hausrath, Senior Vice President, General Counsel and Corporate Secretary, participated as a discussion panelist in April 2004 at a seminar entitled "Corporate Responsibility: Compliance, Prevention and Best Practices" at the University of St. Thomas Law School in Minneapolis. Mr. Hausrath spoke about lessons learned from the sewer fire incident at the St. Paul Park refinery and Ashland's resulting probation.

  Ø **Community Advisory Panels**. Ashland has also formed and participates in several Community Advisory panels for the purpose of facilitating and enhancing communication between local citizens and its chemical plants, and to provide a bridge for the public to voice concerns and questions that can be addressed by those facilities.

  Ø **Product Stewardship**. Ashland has been engaged in product stewardship training that provides product-specific EH&S training at customer request and at customer locations regarding products that are used by the customer, their health and physical hazards, proper handling of the products, and the use of personal protective equipment. Ashland engages in this type of product stewardship training on average once each month.

  Ø **Restoration Of Kentucky Oil Field**. Ashland is engaged in efforts in Martha, Kentucky, to restore the 1,300-acre Martha Oil Field that was

used for major oil production from 1920 until the mid-1980s. Supported by a grant from the U.S. Department of the Interior, this project includes construction of wetlands and watering lagoons, the placement of bird boxes, and the planting of 200 acres of trees and 21 acres of sunflowers and millet. These efforts have produced a resurgence of wildlife in the area.

- **Kentucky Department Of Wildlife Project**. Ashland is currently working with the Kentucky Department of Wildlife to finalize a joint management agreement for property Ashland owns in Lee County, Kentucky. Once finalized, the agreement will provide both land protection and accommodations for hunting, fishing and other related recreational activities. The property will be named the "Ashland Inc. Wildlife Management Area."

- **Dublin, Ohio, Program**. Ashland has developed a successful partnership with the City of Dublin, Ohio, and the Solid Waste Authority of Central Ohio to provide area residents with a safe and environmentally responsible solution for disposing of hazardous household waste. This community service program has now safely collected, removed and properly disposed of an estimated 350 tons of corrosive, flammable or poisonous material, and serves approximately 10,000 households. Ashland provides the location (its Dublin, Ohio headquarters parking lot), does site preparation, and commits approximately 40 volunteers to make the annual Household Hazardous Waste Day possible each year.

- **Ohio River Sweep**. Ashland annually participates in the Ohio River Sweep, a project conducted each year to rid trash and debris from 3,000 miles of Ohio River and tributary shoreline. This project is conducted in partnership with state agencies and community groups. Ashland provides financial, in-kind and volunteer support for this effort that now involves approximately 20,000 Ohio River Valley citizens annually, and has collected more than 100,000 tons of trash and debris since its founding.

- **Franklin County, Ohio, Schools Project**. As part of its United Way activities, over 100 volunteers from Ashland work each year at two or three public schools in Franklin County, Ohio, painting and cleaning those schools and the surrounding grounds.

- **North Carolina Plant Relocation Project**. Ashland's APAC division has implemented a multi-year effort to relocate its stone-crushing plant in Waynesville, North Carolina. This project has provided environmental, health and safety benefits, while also leasing property to the Haywood County Parks and Recreation Department at the rate of

one dollar per year for a community park used by numerous children and adults. This effort has led to Haywood County's first recreational park, and more than 500 people attended the ribbon-cutting and open house ceremony.

- **Corporate Contributions**. In October 2004, Ashland implemented a strategy to increase corporate contributions to environmental causes from an average of 1.5 percent to 10 percent of its annual contributions budget of $3 million. In 2004, Ashland formed the Contributions Strategy Council, which made the recommendation for the increase in environmental-related contributions. Ashland is working proactively with several organizations to find and fund environmental initiatives. In January 2005, Ashland donated $25,000 to support a senior-level environmental health manager serving in an environmental post as he or she pursues a course of study to obtain a Masters of Public Health or Masters of Science degree at Ohio State University.

- **Awards**. In addition to making contributions, Ashland has been recognized for its efforts to improve the environment, and the Company itself recognizes outstanding efforts by Ashland employees and facilities to do so. Ashland's EH&S Challenge Awards program annually recognizes outstanding efforts by Ashland employees to improve the environment in which they work, live and play; in 2004, 12 Chairman's Awards, and in 2005, 10 Chairman's Awards, were presented to Ashland employees for their environmental contributions. In 2004, Ashland was recognized with the Global Plastics Environmental Award for its development of bio-based materials for use by John Deere in the production of its combines. In March 2005, Ashland Casting Solutions was recognized with three awards of excellence for Responsible Care initiatives by the Ohio Chemistry Technology Council. In May 2003, the State of Texas recognized Valvoline's Deer Park facility as a partner organization in the Clean Texas Program for the development of an EH&S system to improve operations and benefit the environment. On March 14, 2005, the Ohio Chemistry Technology Council announced that 31 Ohio facilities of Ashland would receive the organization's Excellence in Environmental, Health, Safety, and Security Performance Award for the year 2004. In 2003, several Ashland facilities received the Council's Award for Excellence: Responsible Care & Environmental Management. Moreover, a number of Ashland plants have received various awards and recognitions. On March 31, 2005, Ashland, for the second consecutive year, was ranked seventh in *Fortune* magazine's list of the world's most admired global chemical companies. Ashland's top scores in that ranking were in two key attribute areas, social responsibility and use of corporate assets.

- **Membership In Organizations**. Ashland has also been active in various organizations that promote compliance and good corporate citizenship: the Global Environmental Management Initiative; the Ethics Officer Association (which Ashland joined at the sponsorship level in October 2004); the Business

Roundtable; the American Chemistry Council; the Ohio Chapter of National Brownfields Association; and the Council for Ethics in Economics.

All of this demonstrates that Ashland has not simply preserved the status quo and done the minimum required during the past three years, but, rather, has used those years on probation to significantly enhance its compliance efforts and to reshape its corporate culture. In this case, clearly the purpose of probation has been served.

## IV. The Interest Of Justice

Here, the factors to be considered at sentencing, the timely and complete fulfillment by Ashland of its obligations under its Plea Agreement and the terms and conditions of its probation, and the laudable conduct of Ashland since December 2002 while on probation all demonstrate that Ashland's request for the early termination of probation is appropriate and should be granted. The propriety and merit of Ashland's request is further supported by the absence of any opposition from the U.S. Attorney's Office, the U.S. Probation Office, or the Probation Consultant. The interest of justice will be served by releasing Ashland from further probation and the government from further expenditure of resources. Ashland has clearly learned its lessons from the St. Paul Park refinery incident, and has applied those lessons to dramatically change the character of the Company. While three years of probation have been valuable, they have also been sufficient.

## CONCLUSION

For all the foregoing reasons, Defendant Ashland Inc. respectfully requests that its motion for the early termination of its five-year term of probation be granted and that it be fully and finally released from probation as of December 23, 2005.

Respectfully submitted,

Dated: December 15, 2005

**FAEGRE & BENSON LLP**

s/ James L. Volling
James L. Volling, #113128
Deborah A. Ellingboe, #26216X
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000

**ATTORNEYS FOR DEFENDANT ASHLAND INC.**

M2:20739964.01